IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 20-mj-03562-LMR-1

United States of America,

    Plaintiff,   Friday, September 18, 2020

  vs.

          Miami, Florida

Jonathan Guerra Blanco,

    Defendant.   Pages 1 through 66


TRANSCRIPT OF PRETRIAL DETENTION HEARING
BEFORE THE HONORABLE JACQUELINE BECERRA
UNITED STATES MAGISTRATE JUDGE


Appearance of Counsel:

For the Plaintiff:  Jonathan Kobrinski, AUSA
        United States Attorneys Office

        Kevin Nunnally, DOJ

For the Defendant:  Eric Cohen, AFD


Transcribed By:   Judith M. Wolff
        Certified Realtime Reporter

TRANSCRIBED FROM RECORDINGS OF AUDIO VISUAL TELECONFERENCE
HELD ON FRIDAY, SEPTEMBER 18, 2020

(Court was called to order.)

THE COURT:  Sir, can you state your name for the record?

THE DEFENDANT:  Jonathan Guerra Blanco.

THE COURT:  Okay.  That's Mr. Blanco.  All right.

Calling United States vs. Jonathan Guerra Blanco, 20-3562-mj-Reid.

Counsel, could you state your appearances for the record, please.

MR. KOBRINSKI:  Good afternoon, your Honor.  Jonathan Kobrinski, on behalf of the United States.  And also with me is Kevin Nunnally, a DOJ trial attorney.

MR. COHEN:  Good afternoon, your Honor.  Eric Cohen with the Federal Defenders office, on behalf of Mr. Guerra Blanco.

THE COURT:  All right.  We're here for a detention hearing, is that correct?

MR. KOBRINSKI:  Yes, your Honor.

MR. COHEN:  That is correct.

THE COURT:  All right.  So Mr. Blanco, can you state your name, please, and your age, for the record.

THE DEFENDANT:  Your Honor, I am (indiscernible) years old.

THE COURT:  All right, sir.  Are you on any kind of medication?

THE DEFENDANT:  Yes.

THE COURT:  What kind of medications are you under?

THE DEFENDANT:  I'm on (indiscernible), and (indiscernible).

THE COURT:  All right.  How long have you been on those kinds of medications?

THE DEFENDANT:  All my life.

THE COURT:  All right.

THE DEFENDANT:  But they keep increasing.  Like as time passes, my condition gets worse and worse and worse and worse.

THE COURT:  All right.  Do you believe that you wouldn't be able to understand today's proceedings because of your condition --

THE DEFENDANT:  No, your Honor.

THE COURT:  -- or because of the med--

THE DEFENDANT:  I understand.

THE COURT:  I'm sorry.  You understand everything?

THE DEFENDANT:  It's cutting out, but I understand, yes.

THE COURT:  All right.  Mr. Kobrinski, do you have any information with respect to his competency?

MR. KOBRINSKI:  The government has no concerns with respect to his competency.  From what we've seen, he understands everything that's going on.

THE COURT:  All right.  Mr. Cohen, do you have any concerns?

MR. COHEN:  I do not, your Honor.

THE COURT:  All right.  So I'm going to find that the defendant is competent to proceed.

So, sir, we're proceeding today on a detention hearing because the government has asked that you be detained without a bond.

Typically that's a hearing that we would do in person.  You would be in my courtroom and you would see the witnesses, you would see the lawyers, obviously you would see me.

We're doing it this way, by video, because of the pandemic.  But you have a right to the hearing being held in person.  So that's a right that you can waive, but I want to make sure you understand that right.

Do you understand it, sir?

THE DEFENDANT:  Yes, I understand.

THE COURT:  All right.  Did you have an opportunity to speak to Mr. Cohen about waiving that right and proceeding instead by video?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And understanding that you have a right to be here in person, and that Mr. Cohen and you have spoken about waiving that right, do you waive your right

to appear in person and instead agree to proceed by video?

THE DEFENDANT: Yes.

THE COURT: All right. Has anyone threatened you or promised you anything to get you to do that?

THE DEFENDANT: No.

THE COURT: Mr. Cohen, are you satisfied that his waiver and consent is in his best interest?

MR. COHEN: Yes, your Honor.

THE COURT: All right. Any objection to proceeding by video?

MR. COHEN: No, ma'am.

THE COURT: Does the United States have any objection?

MR. KOBRINSKI: No, your Honor.

THE COURT: All right. So I'm going to find, given the COVID-19 pandemic and administrative orders of this court, that this hearing should not be further delayed.

I find that we should proceed by video, which is what is best and reasonably available. And I find the defendant's waiver is knowing and voluntary.

All right. How are we going to proceed with the detention, Mr. Kobrinski?

MR. KOBRINSKI: Your Honor, I would ask if I could proceed by proffer, but I would like to just confirm that FBI Special Agent Byran Hughes is available on this ZOOM call as

well?

THE COURT: Yes, he's here. I can see him. Mr. Hughes, Agent Hughes, can you hear me?

SPECIAL AGENT HUGHES: Yes. Good morning, Judge.

THE COURT: Okay.

MR. KOBRINSKI: So, your Honor, if I may proffer?

THE COURT: You may.

MR. KOBRINSKI: Okay. So the ... (indiscernible).

THE COURT: Mr. Kobrinski, you're muted. Mr. Kobrinski, you're mute.

MR. KOBRINSKI: Thank you. Sorry about that.

THE COURT: You hit the mute. All right. Go ahead.

MR. KOBRINSKI: At the outset, I would like to note that the government is moving based on both the danger to community is the risk of flight that this defendant poses. And there is a presumption in this case of detention.

And as relates to his guideline range, the estimated guideline range is 360 to life, and that would include if he accepted responsibility and pleads guilty.

The statutory maximum, as currently charged, is 20 years.

So as to the factual basis for the proffer, Jonathan Guerra Blanco is an ISIS supporter who was arrested in a sting operation last Friday. The defendant operated two online media networks in his effort to support ISIS.

TRANSCRIBED FROM RECORDINGS OF AUDIO VISUAL TELECONFERENCE
HELD ON FRIDAY, SEPTEMBER 18, 2020

And I'm going to refer to them as media networks rather than what they specifically are titled to not promote them further at this time.

These media networks publish content that expressly invoked and promoted ISIS --

THE COURT:  Mr. Kobrinski, I hate to stop you, but I understand that Mr. Dellarosa (phonetic), Mr. Horowitz, does not need an interpreter.  Is that correct?

MR. HOROWITZ:  Judge, an behalf of Mr. Dellarosa, that is correct.  He does not need the services of the interpreter.

THE COURT:  All right.  I apologize, Mr. Kobrinski -- but I can go ahead and dismiss the interpreters -- and given the time of day, I hate to interrupt you to do that -- but I'm going to go ahead and do that and let the interpreters go.

Thank you very much.

UNIDENTIFIED WOMAN:  Thank you, your Honor.

ANOTHER UNIDENTIFIED WOMAN:  Thank you, your Honor.

THE COURT:  Thank you, Maria.  Have a good weekend.

UNIDENTIFIED WOMAN:  You do, too.

THE COURT:  All right.  I apologize, Mr. Kobrinski. You can continue.

MR. KOBRINSKI:  Not at all, your Honor.  That's fine.

So what these media networks that Guerra operated, what they did is they would publish content that invoked and

promoted ISIS, and they would include instructions for would-be terrorists.

The content published by the defendant's media networks included videos glorifying ISIS's violent actions, how-to bomb-making guides, calls for arson in the United States, and calls for attacks in Spain.

In at least one instance, a concert in Madrid, during the 2019 Christmas season, was canceled after the media networks released a threatening video that in turn raised the terrorist threat level in Spain.

So the defendant organized the media networks' efforts. He edited and produced videos and other materials which included incorporating original content created by confederates and stock media footage that the defendant purchased using his father's name and his grandmother's debit card information.

As an example of the original content, the complaint details his interaction with a person that we refer to as Confederate A, and that interaction included the defendant sending over $500 in cryptocurrency to Confederate A from an account that was in his grandmother's name.

But the defendant also used original video content that showed Confederate A, whose face was covered with a mask, like, concealed with a mask, and he was in the video, threatening terrorist attacks in Spain on behalf of ISIS. And

the defendant combined this original footage with stock video and audio to produce a video.

The defendant used encrypted platforms for his online activity.  He would meet people in ISIS-affiliated rooms, and then he would transition to secure messaging sites to try to recruit these people to assist his media network.  He sought to recruit assistance in translating these instructional guides that I referred to, again, the bomb-making kit, a fire-starting guide in the United States, and also to seek their assistance in translating videos in various languages, including Spanish and English.

And he also would recruit people to further disseminate the materials once they were edited and prepared for release.

The defendant would solicit people in these encrypted messaging sites, but then he would seek for them to distribute the material more broadly across the web.

The defendant also would coach these recruits who we know cast themselves as ISIS sympathizers based on the messaging sites that they participated in and, also, because of undercover activity of law enforcement, that they would cast themselves as ISIS sympathizers and supporters.

He would coach them on how to conceal their online activity through various techniques including encryption, virtual private networks, TOR -- T-O-R -- which is sometimes

referred to as the dark web.  And also through the use of secure hardware such as supposedly more secure routers.

In discussing their collective efforts on behalf of media networks, the defendant told one of these erstwhile supports, who actually was an undercover, that without us, the IS, which is the Islamic State, in the online world is dead.

But unbeknown to the defendant, the undercover employees who purported to be ISIS supporters, were also operating on these encrypted platforms and were recording their interactions with him.

Within the past two months, one such undercover employee was introduced to the defendant.  And the defendant told this undercover he was the leader of what is referred to in the complaint as Media Network 1, ISIS Media Network 1, the one that was responsible for the videos that I have already described in terrorizing Spain and putting out those instructional pamphlets.  He told that undercover he was the leader.

Over the course of the communications with the undercover, the defendant made plans to ultimately marry her, and he revealed his real identity by sending pictures of himself and also sending his phone number.

Then the defendant arranged for a meeting last Friday, and the defendant was the one who showed up and was arrested at the meeting.

On that point of phone numbers, there is one thing I want to briefly touch upon because there's an error in the complaint at paragraph 40.

So in paragraph 18, the complaint accurately sets forth that in conversations with the confidential source -- different than this undercover that I was describing for the marriage, a different confidential source -- that he used a phone number in conversations with that source that was linked to a number that had called the defendant's mother on numerous other occasions.

So paragraph 18 sets it forth in that manner, and that's accurate.

But then later in the complaint, in paragraph 40, there is reference to this linkage, but there is a misstatement that the number provided to the source, the same source, belonged to the relative, as opposed to having just been associated with calling the relative, here, it's the mother.

So to be clear, paragraph 18 is accurate that the number that was in contact with the relative, but was not subscribed in her name or that of any other real person.  It was a number that was obtained over the internet and that the records show did not link to anybody.  But the call records show that that number that the defendant used for the source linked to having called his mother.

Then the number that the defendant provided to the undercover, Undercover 3, the one he was going to marry, was actually an accurate number, as opposed to this, I guess you would call burner number, so to speak.

THE COURT:  Right.  But on paragraph 40, that number is associated with who, then?

MR. KOBRINSKI:  So the number from paragraph 40 had called the defendant's mother multiple prior occasions, but it's not associated with anybody.  It's a burner number.

THE COURT:  That's the one on 40?

MR. KOBRINSKI:  Yes, your Honor.  It was obtained over the internet and it was obtained using fraudulent subscriber information, so it doesn't link to anybody or any real person.

THE COURT:  It's that last sentence of paragraph 40 that's incorrect?

MR. KOBRINSKI:  I believe that's correct, your Honor.

THE COURT:  All right.

MR. KOBRINSKI:  I'm just confirming that right now.

Exactly.  It's linked to calling that number.  It doesn't actually belong to the relative.

THE COURT:  Okay.

MR. KOBRINSKI:  Okay.  On the day of the defendant's arrest, law enforcement executed a search warrant of the defendant's house.  The defendant was living with his

grandparents in the Middle District of Florida.

During the search warrant, an office computer was located and was able to be preliminarily reviewed by computer specialists.  That preliminary review shows the use of encryption software and cryptocurrency transactions.

And then, of particular note, the encryption software was the same particular software that the defendant advised the undercover should use when he was giving them advice on how to conceal their online activity.

Likewise, the search warrant recovered the exact same hardware, that router that I previously mentioned that the defendant recommended that the undercovers purchase when he was providing them technical guidance on how to conceal their online activity.

In the defendant's bedroom, various electronics were recovered during the search, including a desktop computer, a laptop computer, and numerous external storage devices.  The forensic review of those devices is ongoing.

The defendant also had two locked hard-style briefcases, one of which I'm going to call a go-bag.  The go-bag was triple locked.  It had a combination lock and two separate padlocks.  The keys to the padlocks were hidden beneath the defendant's mattress.

And notably, also beneath the defendant's mattress, was an ISIS flag that was hand-drawn and also concealed there.

The go-bag contained the defendant's valid Cuban passport, which appeared to have been stamped in March, April, July and December of 2018.  The go-bag also had a wallet that contained approximately $1,674 in cash.

The defendant's relatives were interviewed following the arrest and search.  They informed law enforcement that the defendant continues to get and has previously obtained medical treatment in Cuba, I believe for the condition that's already been discussed today.

The relatives were asked about cryptocurrency transactions.  They said the defendant had asked them for permission to do them in their name, and that he said that it would total approximately $2,000 and that he wanted to do that for investment purposes, so they gave him permission.

There was no permission to transfer money to anyone else.  It was to invest in cryptocurrency.

Records obtained over the course of the investigation show that in 2019, over $17,000 was ultimately placed into cryptocurrency circulation from that same account.

So I had already referenced the sending to Confederate A of over $500 in cryptocurrency and the parents were, the relatives were aware of approximately $2,000 for investment.  But there is $17,000, and it's no longer in the account but it's unaccounted for.

And by virtue of a cryptocurrency transaction, that

could be available to the defendant or it could have been transferred, but to date, it's unaccounted for by law enforcement.

And it wasn't referenced in the defendant's pretrial services report or his disclosure of assets where he referenced having $5 to his name, I believe.

That concludes the government's factual proffer.

MR. COHEN:  Your Honor, if I could cross-examine Agent Hughes.

THE COURT:  Yes.  Please swear in the agent.

BYRAN HUGHES

Having been first duly sworn, testified as follows:

COURTROOM DEPUTY:  Please state your first and last name for the record, and the agency you are currently with.

THE WITNESS:  Byran Hughes, and I'm with the FBI.

THE COURT:  All right.  Mr. Cohen.

MR. COHEN:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. COHEN:

Q.  Good afternoon, Agent.

A.  Good afternoon, sir.

Q.  You're the case agent in this matter?

A.  Yes, sir.

Q.  And you are also the applicant for the affidavit for the complaint?

A.   Yes, sir.

Q.   Would you say that you have more knowledge concerning this investigation than any other law enforcement officer?

A.   Yes.

     MR. KOBRINSKI:  Objection, your Honor.  Relevance.

     THE COURT:  I'll allow it.

BY MR. COHEN:

Q.   Other than the correction that the prosecutor indicated in the complaint, is there anything else that you would like to correct or change or alter in any way?

A.   No.

Q.   The complaint references three -- the terminology being used are online covert employees -- those are FBI employees?

A.   Yes.

Q.   Are they special agents?

A.   No.

     MR. KOBRINSKI:  Objection, your Honor.  Relevance.

     THE COURT:  I don't think that's relevant, Mr. Cohen.

     MR. COHEN:  I'll move on, your Honor.

Q.   Being that they were online covert employees, can we assume that all their communications with Mr. Guerra were by internet, until last Friday?

A.   Yes, that's correct.

Q.   So there was no face-to-face contact until Friday?

A.   That's correct.

Q. Even on Friday, was there any contact between Mr. Guerra and OCE 3?

A. Not face-to-face. No.

Q. Were there any telephone conversations between any of the three OCEs and Mr. Guerra?

A. Yes.

Q. At what number?

A. I don't know offhand the number of phone calls. I know that it was with OCE 3 and it was substantial, the number of telephone calls.

Q. And what's the timeframe that those calls began?

A. I believe since July. But I don't have the exact date offhand.

Q. And were you able to trace the number of the phone that he was using to any particular individual?

A. Yes.

Q. And who is that?

A. The defendant was using a WhatsApp number that was linked to a telephone number which subscriber records show belonged to his grandfather Ciro (phonetic).

Q. So at least as of July, you had an indication of Mr. Guerra's identity, correct?

A. Yes.

Q. So the complaint also references a confidential human source, is that person an employee of the FBI?

A.  No.

Q.  Is that person involved in law enforcement in any way whatsoever?

A.  To the extent that they are actually a confidential human source, yes.

Q.  Is that person or has that person received any benefit for his cooperation with the government in this investigation?

MR. KOBRINSKI:  Objection, your Honor.  Scope of the hearing.

THE COURT:  Sustained.

MR. COHEN:  That was sustained, your Honor?

THE COURT:  Yes.

BY MR. COHEN:

Q.  Was there any face-to-face contact between Mr. Guerra and the CHS?

A.  Well, I have to specify, specifically.  There was visually identifiable information that would identify Mr. Guerra that was sent to the CHS.  But beyond that, that would call for information that's currently classified, sir.

Q.  Okay.  And from my reading of the complaint, and I think that Mr. Kobrinski just clarified, that Mr. Guerra provided the CHS a phone number back in 2019?

A.  Yes.

Q.  And that would have been in November of 2019?

A.  Yes.

Q.  Were there any communications by phone between the CHS and Mr. Guerra after that?

A.  No.

Q.  Was that the same phone number that you just addressed before, about relating back to Mr. Guerra's grandfather?

A.  No, it was not, sir.

Q.  So also assuming that these were covert employees, they were pretending to be something that they weren't, correct?

A.  Correct.  They were portraying ISIS sympathizers.

Q.  And I think be the government referred to them as undercover officers or agents, would that be accurate?

A.  I'm sorry.  Could you repeat that?

Q.  Sir, I think the government referred to them as undercover.  Would that be an accurate description of what they were doing?

A.  Yes.  It is undercover.  Yes.

Q.  Okay.  So going forward, the complaint also references several social media platforms, correct?

A.  Yes.

Q.  Now these are readily available apps, correct?

A.  Yes.

Q.  And at least one of those apps has millions and millions of users?

A.  That's correct.

Q.  So it's nothing that Mr. Guerra had to go to the dark web

or anything of that nature to obtain?

A. No. To obtain the accounts -- excuse me, to obtain the platform access, no.

Q. So the encrypted platforms were essentially one-to-one communications, if I understand correctly?

A. Yes. They can be. One specifically functions as a one-on-one communication application. But it also functions as you can be involved in groups or channels.

Q. So they're not designed for disseminating to mass audiences, are they?

A. Well, I would say with respect -- considering the one, like you said, has been downloaded and used by millions of users, I would say that it certainly is, has the ability to broadcast within that community of users' content.

Q. Was anything broadcast using these particular social media platforms by Mr. Guerra to a mass audience?

A. I would say specifically to a mass audience, I think I would have to say that he specifically disseminated within broader groups.

But beyond that, I would say that that would be a downstream -- I would use that term, just downstream in the sense that those subsequent people that consumed his media would then disseminate it further, at his instruction.

Q. So the groups just specifically that he was disseminating to, about how many persons are we talking about?

MR. KOBRINSKI: Objection, your Honor. Relevance for this hearing.

THE COURT: I think that's -- it's not relevant, Mr. Cohen. You can move on from that point.

I understand the point you're trying to make, right, he's broadcasting it to a set group, and that set group broadcasts to others, right? But how big that group is I don't think is relevant for detention.

MR. COHEN: I think the point, your Honor, if I may, is that he's disseminating to a small group, and what happens after that is up to others.

THE COURT: No, I understand the point. I don't think you need -- in terms of how big that group is, I don't think you need that information. I think you can make the argument you just made with respect to detention.

MR. COHEN: Yes, your Honor. Thank you.

Q. So you've been investigating Mr. Guerra specifically since November of last year, is that correct?

A. Since approximately October of last year.

Q. And he was arrested in September of this year?

A. Yes, sir.

Q. So that's approximately 11 months?

A. Yes.

Q. During that time, did you or any law enforcement agency try and make any efforts to shut down his so-called

organization?

MR. KOBRINSKI: Objection, your Honor. Relevance.

THE COURT: Yes, I will sustain that objection.

Mr. Cohen, if the argument is going to be that they've let him out this long and he hasn't been a danger, again, you can make that argument. But in terms of having the agent testify about it, I'm going to sustain the objection.

MR. COHEN: That's fine, your Honor. And you are prescient in terms of what the argument will be, your Honor.

Q. Was any attempt made by an identified law enforcement officer to meet with Mr. Guerra and speak to him about what he was doing or what his motivations were behind what he was doing?

A. Absolutely. We've been trying, since the onset of this investigation, to identify him. But his tradecraft online has honestly been unprecedented in terms of what I have personally encountered and what has been encountered by my colleagues in terms of obfuscating his online presence. The use of VPNs, TOR, other services similar to this as outlined in the complaint.

So the intent of the investigation was to actually identify him. It just took a very long time because of how sophisticated his techniques were.

Q. So at least as of July, if I understand it, he sent his name and photographs of himself and his daughter to OCE 3,

isn't that correct?

A.   Yes.

Q.   So that would have been approximately three months ago, correct?

A.   Yes.

Q.   Was any effort made in the last three months to have a face-to-face meeting with Mr. Guerra by an identified law enforcement officer to discuss with him what he was doing and why he was doing it?

A.   The efforts still, again, up until the day of arrest, up until the submission of my affidavit was to actually 100 percent confirm we had the right person.  That's what we wanted to ensure we had.

So it took some time, but yes, that was our effort. That's what we intended to do.

Q.   You intended to eventually meet with him?

A.   We intended to eventually arrest him.  We had evidence at that point of what he was doing online, but we wanted to, like I said, confirm his identity.

Q.   So after sending his name and photographs with him and his daughter, did you do any investigation to confirm who he was at that time?

A.   We confirmed those identifiers that he provided, that they were accurate according to open source records.  But we wanted to confirm that he was in fact the user behind the keyboard,

so to speak, sending that information to our OCE.

Q. So up until September 11, you weren't sure that he was the user of that keyboard who was sending the information, is that what your testimony is today?

A. No. I would say that I wasn't sure up until the time that I submitted my affidavit.

Q. Which was when?

A. I don't know, offhand. I want to say it was the beginning of September.

Q. Okay. Well, the copy that I have shows the date is September 10, which was the day before he was arrested. Would that be accurate?

A. That's accurate, yes.

Q. So up until the day before he was arrested, you say you still had some question as to whether he was the person who was operating the computer?

A. Well, let me clarify. It took some time to actually prepare the affidavit, so to say that I knew on the date that I submitted the affidavit, no. I misspoke.

I mean to say that several days before, in the process of preparing the affidavit. When I sat down to prepare the affidavit, I was sure that Mr. Guerra was the user behind the accounts.

Q. And what happened -- okay. So -- I'm sorry. Strike that.

And that was before he traveled to Miami, to meet

with OCE 3, correct?

MR. KOBRINSKI:  Objection, your Honor.  Scope of the hearing.

THE COURT:  I'm going to allow it.  I just think he needs to clarify a little bit what the timing was.  I think when the agent said he presented it, I think there is some confusion as to if that meant whether when the judge signed it, or when he started preparing it.

So I will just let you clarify that point.

MR. COHEN:  Sure.

Q.  So my understanding, and please correct me if I'm wrong, is you had some information specifically identifying Mr. Guerra in July, is that accurate?

A.  Yes.

Q.  You began preparing your affidavit say in early September, would that be fair?

A.  I think it's safer to say at the end of August.

Q.  Okay.  Somewhere in that timeframe.  Still, a month or more after the pictures and his name was provided to the government, is that the correct timeframe?

A.  Yes, sir.

Q.  So the fact that you say you were sure it was him when you started to prepare your affidavit, you were not relying on his meeting with OCE 3, because that hadn't occurred yet, correct?

A.  We knew who he was, but I think it was the final evidence

that he in fact was the user.  We knew everything pointed to the fact that he was the user of the accounts, but him showing up was just another example of, a confirmation, rather, that he was in fact that user.

Q.  So how long before you started to prepare your affidavit did you know he was the user?

A.  I'm sorry.  Can you repeat the question.

Q.  How long -- I didn't mean to cut you off.

How long before you started preparing the affidavit did you know he was the user?

A.  I would say a matter of days, sir.

Q.  So he was not the first target of your investigation, is that fair?

MR. KOBRINSKI:  Objection, your Honor.  Relevance.

THE COURT:  That's sustained.

MR. COHEN:  Your Honor, it has to do with Confederate A, who was part of the proffer.

MR. KOBRINSKI:  Your Honor, just because the -- he was proffered doesn't mean every grounds into that individual is fair game for a detention hearing based on this defendant's risk of flight or danger, in the government's view.

THE COURT:  I think that's right, Mr. Cohen.  If there is another target or the investigation beginning one way and ending up another, I don't see how that's relevant to detention.

MR. COHEN:  Actually that wasn't my point, your Honor, but I will move on.

THE COURT:  Okay.

BY MR. COHEN:

Q.  So there was proffer about Confederate A, and confederate meaning that he was a confederate supposedly of Mr. Guerra, that's the terminology, correct?

A.  Yes.

Q.  And Confederate A is a foreign national living abroad, is that accurate?

A.  Yes.

Q.  Without identifying too specifically for whatever concerns or security we have, he was somewhere in the Middle East, is that fair?

A.  In Asia, sir.  Yes.

Q.  So let's talk about IMN 1 and 2 for just a bit.

According to the complaint, they were not part of the ISIS', I think your terminology was official media components, were they?

A.  No.

Q.  So they were not funded by ISIS, correct?

A.  I can't say directly, but I have no evidence suggesting that.

Q.  Okay.  And is there any indication that they were getting orders or directives from ISIS as to what they should do?

A.   No.

Q.   When did, just starting with IMN 1, when did they first become, first come to law enforcement's attention?

MR. KOBRINSKI:  Objection, your Honor.  Beyond the scope of the proffer and the hearing.

THE COURT:  Mr. Cohen, where are you going with that one?

MR. COHEN:  Your Honor, if this was being -- if they were aware of IMN 1 long before Mr. Guerra became the focus of the investigation, it sort of detracts from their argument that he's the leader of it.

MR. KOBRINSKI:  Your Honor -- I'm sorry.

THE COURT:  You can respond, Mr. Kobrinski.

I'm not sure that you've made the argument that he's a leader or not, necessarily, but go ahead.

MR. KOBRINSKI:  Your Honor, just on that point, I failed to mention something that now that we're on that topic, I should have mentioned this during my proffer and I think that it's fair grounds, to the extent Mr. Cohen wants to cross, as well.

There is an international arrest warrant for Mr. Guerra.  So he's the subject of, effectively, it's like a red notice, except it's only been distributed to select countries, including the United States.  And it's on the basis of his involvement and participation in that media network

that we're discussing, IMNI 1.

And the government did proffer that he is an organizer and, effectively, he represented himself as the leader of the organization.

But I just think how long they've been on law enforcement's radar still is beyond the scope of the hearing and the proffer on the particular point that Mr. Cohen was questioning.

THE COURT:  All right.  Mr. Cohen, you can continue. You heard the representation now.

MR. COHEN:  There was a question pending, your Honor.

MR. KOBRINSKI:  I'm sorry, Judge --

MR. COHEN:  I don't know if you had sustained the objection or not.

We sort of got into a discussion before -- you may have ruled and I did not hear it.

THE COURT:  No, I hadn't ruled, but I want to hear what the question is again because Mr. Kobrinski has made a different representation or an additional representation to me now.  So what was the question?

MR. COHEN:  It was When IMN 1 first came to the attention of law enforcement?

MR. KOBRINSKI:  And I object to that, your Honor. It's beyond the scope of the proffer and the hearing.

THE COURT:  I'm going to sustain that objection.  But

again, Mr. Cohen, there is other information Mr. Kobrinski is directing me with respect to him being an organizer or leader, so you can continue on that road or the information you just got about the arrest warrant.

MR. COHEN:  Thank you, your Honor.

Q.  So without going through a number, there are other reported members of this group, is that right?

A.  Yes.

Q.  Did Mr. Guerra communicate with each of those other members, do you know?

A.  I can't say specifically.

Q.  Your complaint talks about him recruiting individuals.  Do you recall that?

A.  Yes.

Q.  And I think that was part of the government's proffer also, correct?

A.  Yes.

Q.  Did he ever offer anybody some benefits or compensation for participating in what he was supposedly proposing?

A.  Yes.  But that answer calls for classified information, sir.

Q.  So at least two of the four people that you reference in your affidavit, he was trying, I think your terminology was, to pursue romantically, is that true?

A.  Yes.  Two he pursued romantically, yes.

Q.   So it wasn't that he was necessarily acting for terrorist motivation, he was trying to develop a relationship with these individuals?

A.   He identified them in pro-ISIS Telegram rooms.   And specifically portrayed himself to have a, sort of a role, sort of a leadership role within these Telegram groups.   And then ultimately, when he learned that they were female, pursued them romantically.

Q.   So let's talk about CHS for a second.   If she had no foreign language skills, what purpose was she going to have within this operation?

A.   I'm not sure.   It's possible she was --

MR. KOBRINSKI:   Objection, your Honor.   For the purpose of this hearing.

THE COURT:   Well, Mr. Kobrinski, we lost you.

MR. KOBRINSKI:   Hello.   I'm sorry about that.

I objected that the role of CHS is not relevant for the purpose of PTD, and it's beyond the scope of what I proffered.

THE COURT:   I'll overrule the objection.   I think the question is phrased a little differently.

I will let the agent continue.   He was halfway through the answer anyway, Mr. Kobrinski, because we couldn't hear your objection.

MR. KOBRINSKI:   Sorry about that.   I got kicked off

the ZOOM several times.  I switched devices.  So I apologize.

THE COURT:  Not a problem.

Agent Hughes, you can continue your answer.

THE WITNESS:  Okay.  I think no, he didn't specifically request that the CHS, he didn't recruit the CHS specifically for translation services.  But it's certainly possible as with some of his other network members that the CHS could have, he could have requested the CHS to disseminate the media at his request.

BY MR. COHEN:

Q.  The CHS was working for you.  Did he actually make that request?

MR. KOBRINSKI:  Objection.  Beyond the scope of the proffer.

THE COURT:  I'll allow it.

THE WITNESS:  I'm sorry.  Could you repeat your question, sir?

BY MR. COHEN:

Q.  You said what could have been done.  The CHS is an FBI operative, or whatever terminology you want to use, correct?

A.  Yes.  The confidential human source.

Q.  You're the FBI, right?

A.  Yes.

Q.  You would know if those questions were ever asked of the CHS by Mr. Guerra, right?

A.   Yes.

Q.   Were they?

A.   No.

Q.   Okay.  So what could have been done is not what actually happened?

A.   No, that's correct.

     I thought you were asking specifically, even though the CHS was not doing translation services, I thought you asked me to essentially make an estimation of what could have been their role within their media network.

Q.   Okay.  If that was the impression, I apologize.

     So a lot of the proffer, a lot of your complaint talks about Mr. Guerra's efforts to avoid detection, that's a fair statement, correct?

A.   Yes.

Q.   Okay.  But again, he did give a phone number to a CHS as early as November of 2019, that's fair?

A.   Yes.

Q.   And he did provide very specific information concerning him and his two-year-old daughter to OCE 3 during the summer?

A.   Yes.

Q.   How long had he known OCE 3 before he made -- provided that information?

A.   I believe about a week.

Q.   So in paragraph 21 of your complaint, do you have that in

front of you?

A.  No, I don't, sir.

Q.  Okay.  So in the first paragraph or the second paragraph dealing with communication with OCE 1, you referred to (indiscernible) occurred prior to November of 2000, (indiscernible).  Is that why you said that the investigation actually began in October?

A.  Yes.

Q.  At different times in your complaint you indicate that IMN 1 took some activity, that they produced something or released something.  Do you know what Mr. Guerra's specific role was in that activity?

MR. KOBRINSKI:  Objection, your Honor.  Compound question when you're referring to multiple times in a complaint.

MR. COHEN:  Okay.  That's fair.  I was trying to speed things up, but I'll go one-by-one.

And without having the complaint in front of you, it makes it a little bit more difficult, but --

MR. KOBRINSKI:  Well, it's also beyond the scope of the proffer, your Honor.

THE COURT:  But it's in the complaint, so I'm going to let him ask it.  I don't know that he has to go through every instance in the complaint to make the point, but I will give him some latitude on that.

BY MR. COHEN:

Q.  So on paragraph 22, I know you don't have it in front of you, but it says on 16 November -- I'm sorry -- paragraph 23.

In early November 2019, IMNI produced and widely released a video and SNP 1 which threatened terrorist attacks against Spanish national police.  And then it goes on with more descriptions.

Do you know what Mr. Guerra's role was in producing and widely distributing that video?

A.  If it's the video I'm thinking of, and if -- again, I don't have the complaint in front of me -- but is this also the video where the masked individual of Confederate A appears?

Q.  Yes.

A.  Okay.  I can -- I will say that the video specifically has a certain sound effect throughout the video that is a Motion Elements product.  I know that records show that Mr. Guerra downloaded the actual product as well as purchased access to the content in 2019.

Q.  But in terms of actually producing it and releasing it, do you know what his involvement was?

A.  I would say that that goes to his production, the fact that a specific editing element went into the video purchased by Mr. Guerra.  I can't speak to his dissemination right now.

Q.  So later on in your complaint you talk about purchase of

stock information from -- or stock videos from various sources that are readily available.  Do you recall that part of your complaint?

A.  Yes.

Q.  And the complaint mentions that Mr. Guerra had a subscription or bought a subscription to at least one of those distributors, do you recall that?

A.  Yes.

Q.  The complaint does not mention anything about him buying any particular items.  Do you have evidence that he actually purchased any of the items, or that he just had a subscription?

A.  I have evidence that he purchased an annual subscription. And I also have subscriber records specifying the exact product that he downloaded.

Q.  Okay.  Any reason why that wasn't included in your complaint?

A.  Just --

MR. KOBRINSKI:  Objection, your Honor.

THE COURT:  I'm not going to allow that question.

THE WITNESS:  We just received those records.

MR. KOBRINSKI:  I'm sorry.  Judge, did you allow that question --

THE COURT:  I did not --

MR. KOBRINSKI:  That's what I thought.

THE WITNESS:  Oh.  I'm sorry.  I thought -- I misheard you.

THE COURT:  All right.

BY MR. COHEN:

Q.  The video itself with Confederate A, do you have any indication that Confederate A ever traveled to the United States?

A.  That calls for classified information, sir.

Q.  Do you have any indication that Mr. Guerra ever traveled to Asia?

A.  No, sir.

Q.  When the search was done of his bedroom, was any video equipment found there?

A.  No.

Q.  Are you aware that Confederate A has a sister?

A.  That calls for classified --

MR. KOBRINSKI:  Objection, your Honor.

MR. COHEN:  Okay.  That's fair enough.

Q.  On any of these posts that Mr. Guerra supposedly made, was there any accompanying text other than just the images?

A.  Can you clarify your question?  I'm sorry.

Q.  The terminology I used may not have been very precise.

So supposedly he posted, or somebody on his behalf posted images on one of these platforms, correct?

A.  Yes.

Q.  Was there any text, any comments accompanying those images?  Was anybody, say, we need to do the same thing that's shown in this video.  Any encouragement of anybody participating in any violent activities?

A.  I would say that when he would post the contents, specifically one instance that I know is mentioned in the complaint was a preview graphic before the widespread release of the one threatening video, threatening Spain, but he specifically directed the OCE, hey, check out this preview.  That's just my summary of what he said, not verbatim.

But other than that, I can't speak to other -- we have records of what he said to show context around each posting, but I don't have any offhand.

MR. COHEN:  Your Honor, I'm not going to go through each incident.

Q.  So you also make reference to --

A.  Sir.  I'm sorry.  Could I answer your question more fully?

Q.  Sure.

A.  Because I can think of one instance where Mr. Guerra was directing OCE 3 in the translation of a violent ISIS video called Battle of Attrition 3.  It's noted in the complaint.

He noted that Jihad is -- was the OCE's duty.

So I guess to more fully answer your question, you asked if there was any contextual statements that he made, so I would offer that up.

Q.  Okay.  Which brings me to a question I was going to ask in had a couple of minutes, but since we're here, Jihad could have several different meanings, correct?

A.  Yes --

MR. KOBRINSKI:  Objection, your Honor -- sorry.  I withdraw the objection.

BY MR. COHEN:

Q.  So it doesn't have to be any kind of military or forceful action?

A.  No, sir.

Q.  It could just be some sort of religious action on behalf of Allah?

A.  Yes.

Q.  So the fact that he said -- made reference to Jihad, that doesn't necessarily mean he was provoking or encouraging any kind of violent activity, correct?

A.  Correct.

Q.  You make reference to some guides within the complaint. Is the examination of Mr. Guerra's computer far along enough to know whether any of those guides were actually found on the computer?

A.  No, it's not, sir.  It's still ongoing.

We actually asked Mr. Guerra, post *Miranda*, if he would provide access to the devices, but he declined.  So we're having to go sort of the long route of trying to use

tools to enter the devices.

MR. COHEN:  If I can just have a second, your Honor.

THE COURT:  Um-h'm.

(There was a pause, and proceedings continued as follows:)

BY MR. COHEN:

Q.  So I just have -- at one point in time I believe it was OCE 3 asked Mr. Guerra about what his goal was -- I'm sorry. It was OCE 2, OCE 2.

In his response, he never indicated that it was to take down the United States government or perform any kind of violent acts, was?

A.  His specific response was that he wanted to get the word out there, so to speak.

Q.  The government, in its proffer and complaint, make reference to $572 in cryptocurrency that was sent last year to Confederate A, do you recall that?

A.  Yes.

Q.  Is that the only money transfer that you've been able to confirm during your investigation?

A.  That partially calls for classified information, sir.

Q.  Were you privy to the communications that preceded him sending the money to Confederate A?

A.  No.

Q.  So you don't know what the conversation was that prompted him to send the money?

A.   Correct.

Q.   And when Mr. Kobrinski added to the complaint this reference to the $17,000 in cryptocurrency, he said it was unaccounted for.  Does that mean the source is unaccounted for, or where it is now is unaccounted for, or both?

A.   It means that where it is currently is unaccounted for. We know the source of the $17,000 was his grandmother's credit union account.

Q.   So in the complaint you mention that one reason why somebody would use anti-detection precautions is not to get bounced off of social media, is that a fair recap?

A.   I think I said specifically that they would avoid using certain terms.  Is that what you're referring to?

Q.   Yes.

A.   Yes, that is correct.

Q.   Okay.  But there might be other reasons why somebody would want to avoid detection.  I know it's the government's position that he was trying to avoid detection by law enforcement.  I imagine you would confirm that that's your thoughts?

A.   I would certainly -- I -- it's -- I think the evidence shows that he was trying to avoid law enforcement detection.

       I think what you're asking me is whether any person would normally do that in the course of their conduct, is that what you're asking?

Q.  I'm just saying there may be other reasons why somebody would want to the avoid detection on social media?

A.  Avoid detection, yes, specifically.  I don't know why anybody would want to avoid using the word Jihad or bomb.  I'm not -- I wouldn't be certain of that.

Q.  Well, you said that they were afraid that it might get caught by the administrator of the network, and they would be asked to leave?

A.  You're right.  Yes.  I understand what you're asking.  Yes.  That is correct.

Q.  So even a discussion over drinks about Jihad -- well, actually, it would have to be the internet if we're talking about it -- somebody may be afraid to use that term because even an innocent conversation could be misconstrued and they could be kicked off of the platform, is that accurate?

A.  I think that's fair.  Yes.

Q.  During the proffer there was an indication that there was some activity in Spain that was canceled, I think it was a concert, based on one of the videos.  Do you recall that?

A.  Yes.

Q.  During the course of your investigation, have you been able to link any specific act of terrorism to Mr. Guerra's activities?

A.  No.

          MR. COHEN:  I have nothing further, your Honor.

THE COURT: Mr. Kobrinski.

MR. KOBRINSKI: Just to clarify a couple points.

DIRECT EXAMINATION

BY MR. KOBRINSKI:

Q. Agent Hughes, with respect to the timing between intending to write the complaint and the actual arrest, what -- and I don't want to get too bogged down into the process, but did you have to get approval for declassification?

A. Yes.

Q. Is that something that is still ongoing, and is part of the reason you weren't able to answer some of the questions today?

A. Yes, sir.

Q. And so is that a quick process, or a lengthy process?

A. It's a very lengthy process.

Q. Was this something that had to go through different rounds of review?

A. Yes, it did.

Q. Once you are able to identify who the person was behind the keyboard to the satisfaction of the probable cause standards of the complaint and the search warrant, once you were able to do that, how long did it take you to personally start seeking those applications?

A. I started the process immediately.

Q. Now subsequent to making those applications, is it fair to

say some of the items that we proffered in the earlier part of this hearing related to the ISIS flag under his bed, the go-bag with the Cuban passport in his room, and the encryption software, and then, finally, the defendant himself showing up to the meet location with the undercover, all tend to corroborate that application that you previously made for the search warrant and for the complaint?

A.  Yes.

MR. KOBRINSKI:  Nothing further.

THE COURT:  All right.  Government, anything else?

You're on mute, Mr. Kobrinski.

MR. KOBRINSKI:  I'm sorry, your Honor.  Whenever I switch the view, it mutes me.

I have argument, your Honor.

THE COURT:  Please proceed.

MR. KOBRINSKI:  Thank you.

So with respect to the danger that this defendant poses, and I understand his medical condition and we're obviously very concerned about it and want to make sure he gets suitable medical treatment, which I believe he'll get in the B.O.P.

But even that actually goes to more of the flight risk.  He gets it right now in Cuba, and that's a big concern -- at least in part he gets it in Cuba -- and that's a big concern for the government and it should be for this Court

as it is fashioning a bond.

As to the medical condition itself, he was able to -- it's a life-long condition, as Mr. Guerra himself stated, and he was able to commit these crimes which call for a presumption with that condition.  And he was able to commit these crimes using very sophisticated techniques for concealment and then also by dragging his family into it.

The cryptocurrency transactions, the phone numbers, the bank account information, the purchase of the stock footage, all done in other people's names.

When you have this dedicated of a user who is this capable, as I believe Special Agent Hughes described him as savvy as he is, there is no condition the Court can fashion short of pretrial detention that's going to protect the community.

And that's particularly a concern in this stage of the -- I mean it's always a concern, and for this case, it's something that's going to last beyond even the trial period with this defendant, but as of right now the forensics are ongoing.

So he could notify the confederates, he could seek to obstruct the course of the investigation while the government is still learning about his online activities and his online context.  So that savviness, that sophistication and his dedication to this cause all show that he's a danger.

And that same savviness and dedication also goes to the risk of flight factors which I would like to briefly address.

So first, he's facing a significant incentive to flee. He's been caught and he's been exposed and he's facing a guideline range of 360 to life, with a 20-year statutory maximum. And there is case law that discusses 10 years being a significant incentive to flee. This is double that. And there are charges related to the conspiracy he engaged in in the substantive charge that he's been charged with.

He doesn't have substantial ties to our district. Now, he is married to somebody who lives here, but as the pretrial services report reflects, he doesn't have any information about her, and the circumstances of that marriage, which took place in 2017, in Cuba, are very questionable.

When the pretrial services officer questioned him with details of the marriage, he didn't have any information. So that's, in and of itself, a concern and that's his tie to this district.

Other than that, his ties are to the Middle District of Florida. But even there, his ties aren't that substantial.

The pretrial services report referenced $5 in his bank account. The pretrial services report didn't reference his possession, I believe, my review of it, that he possessed a Cuban passport. It only referenced a U.S. passport.

Well, he has both and he has frequent travels.  2019 to Mexico, on the American passport, and on multiple occasions (indiscernible).

I'm sorry if I (indiscernible) multiple occasions where he had travel with the Cuban passport, including March, visa (indiscernible), March, July and December.

But he didn't reference any of those in his statement to the pretrial services officer.  All he discussed was his marriage in 2017, but none of the other more recent travel.

So that of course is also a concern with it being just a boat ride away and the defendant having that go-bag packed with over $1600 in cash and all of this unaccounted-for cryptocurrency.

And, it's unexplained in terms of the defendant is unemployed and doesn't have any source of that substantial amount of (indiscernible).

And then the last point on that topic.  Just the discrepancies between what the defendant stated and what the pretrial services report or the investigation shows also goes to either a lack of candor or other reasons to give pause to any assurance that a bond condition would assure his appearance in future proceedings before this Court.

So based on those factors that we've outlined, we respectfully request that pretrial detention be ordered in this case, your Honor.

THE COURT:  Mr. Cohen.

MR. COHEN:  Yes, your Honor.

In terms of danger, I think your Honor already noted what my primary point or at least my first point was going to be.  Again, I understand that they need to develop his identity for a period of time, but at least as of July, they knew or should have known who he was.

He sent photographs of himself, he gave his name to somebody he was trying to woo.  There is no reason to believe that if he's trying to engage in a romantic relationship with somebody that he's going to be deceitful about his identity and showing them pictures of a fake daughter that he would not be able to show later on in person if his plan comes to fruition.

So there was a period of time where the government knew who he was and didn't act on it.  They didn't search him out, which was my question which effectively I never really got an answer to.  It was we see this stuff going on, tell us what's happening, you know, what's your motivation, why are you doing it, what are you thinking?

That may have been because they didn't want to reveal the investigation.  I understand that, but there were certain things that could have been done for them to fine-tune what it was that Mr. Guerra was doing and why he was doing it.

So I think maybe the most important question or

answer that I received during cross-examination was the last one.  So the government, even at this point in time, cannot correlate any single act of violence to any of Mr. Guerra's activities.

So whatever the reason for that is, there has been no damage except for maybe the canceling of a concert related to activities.  And, in some respects, based on a reading of the complaint, there are questions as to how much Mr. Guerra was personally involved in some of those incidents.

The Court has read the complaint, I'm sure, so I'm not going to belabor that.

So as the government notes that these activities took place while Mr. Guerra obviously has his medical conditions, but they all took place based on (indiscernible).  There was not a single act other than communicating on the internet that the government has established here.

I have been in contact with his family.  His parents have told me that they are willing to remove every electronic device with internet access from their home.

And they are willing to put him on, for lack of a better term, 24/7 supervision to make sure either his parents or his grandparents will be with him at all times to ensure that he is not violating his bond by getting on the internet and engaging in any kind of activity.

And to make that even more pressing, more than just

the love of their son and their concern for his medical needs, and this also goes to risk of flight, his parents have $100,000 that they are willing to use to secure a bond.  And they're also willing to use their home, which they've had appraised since Mr. Guerra's arrest, of $280,000 without a mortgage, also to secure his appearance.

So they are willing to risk everything that they have because they feel confident that they could monitor Mr. Guerra, now that they know of the allegations, and make sure that he has no other contact with anybody over the internet.

And certainly pretrial services or probation can come to their house on a regular basis to confirm that.  We suggest that he be under 24-hour curfew with monitoring so we make sure that he doesn't have access to outside internet capability.

So I think that there are conditions that the Court can fashion to make sure and limit or eliminate any kind of internet activity by him.

Risk.  Because of his medical condition, he cannot live on his own.  He lives now with his grandparents.  He will be living with his parents if he was to be released.

There is no indication, even if he was motivated to leave the Middle District of Florida, which is just across the peninsula, no indication that, at 23 years old, he would have

any motivation to leave his parents, his grandparents, his sibling and his two-year-old daughter.

He doesn't have the financial capabilities on his own to go live somewhere else; he doesn't have the physical capabilities on his own to go live somewhere else.  And there is no -- and now, knowing that the significant financial stake that his parents are willing to accept to make sure that he appears, there is certainly no reason to suggest that he would take off and endanger his parents and his grandparents' future.

What it really comes down to, the most compelling reason is his health.  He has had multiple surgeries for heart defects beginning when he was two.  There was a surgery scheduled for August of this year, but because of the pandemic, he wouldn't be allowed any visits and he was concerned about being in a hospital by himself for that family concerns.

And frankly, concerning his travel, before his arrests, there were thoughts about him going back to Cuba and consulting with a doctor who performed his last surgery in 2018.

So the government referenced his passport showing travel in 2018, and that was for surgery.  And I think it's significant that when he traveled, he used his passport.  He wasn't being deceitful.

He wasn't going on that short boat ride that the government made reference to.  He was acting openly.

I can't even begin to read the number of heart ailments that Mr. Guerra suffers from.  But the suggestion that he's being treated at FDC, first of all, we know of the high COVID numbers at FDC.  We know that CDC has said that persons with heart disease and serious heart disease are particularly vulnerable to contracting COVID or having their problems exacerbated by the disease.

We know that at least for several days, and that was something that I was hoping we could inquire of him today -- he was not receiving all of his medications.

So to suggest that he's going to receive the same kind of medical attention in FDC that he was getting at home with multiple doctors and multiple physicians is just not really supported by the record.

So we feel that the conditions limiting his access to the internet should solve any problems or concerns concerning his further activity.

And the fact that his parents' financial stake and their willingness to supervise him should relieve concerns about his risk of flight.

And weighed against all that is obviously the greater concern or significant concern that if he's kept in custody, this may become a potential death sentence.  And I'm not

trying to be dramatic, I'm just trying to be realistic in the assessment, based on what I know of his medical condition.

THE COURT:  Anything else on behalf of the government, Mr. Kobrinski?

MR. KOBRINSKI:  Your Honor, if I could very briefly respond to a couple of the points that were just raised.

One, as lamentable as his medical condition is, only in this case is either a basis for compassionate release, which is not one of the factors under the Bail Reform Act, or effectively of incentive for him to flee, or a basis for him to continue to see -- and related to that, that he's seeking treatment in Cuba.

The pretrial services report, when he was interviewed, what it says is I have been to Cuba long ago and I went in 2017.  He didn't mention any travel, and he didn't mention a Cuban passport.

So while it's laudable that he used the passport for entry, as far as we know, he denied making those statements. And the fact that he used it in the past, his circumstances have changed very significantly.

With respect to the other points raised by Mr. Cohen regarding the delay, I don't think that that is -- there is anything in the record to suggest there was any undue delay in this case.

Agents moved expeditiously once they were able to

identify him in seeking to make the application for the complaint in the search warrant and then they further solidified his identification.

Then, the suggestion well, no terrorist activity related to his media networks calls to join ISIS and to support the Islamic State and to conduct terrorist attacks, arson attacks, bomb making, the charge is material support for ISIS.  It's not conducting a terrorist attack himself.

And that's something he can continue to do from the internet, as he's done in the past.  So it's not enough to suggest that well, we can't link any specific attack to what he's done to show that he's not a danger because what the statute prohibits is precisely what this defendant has done.

So again, we submit that this is a strong detention case, your Honor.

THE COURT:  Mr. Cohen, was his 2018 surgery, heart surgery that's in the pretrial services report, did it take place here or in Cuba?

MR. COHEN:  That took place in Cuba, your Honor.

THE COURT:  All right.  I'm ready to make my decision.

All right.  I know that the government here has sought to detain the defendant both on the argument that he presents a danger to the community as well as the fact that his release could pose significant likelihood that he would

not return for any further court hearings.  The government's burden as to each is different.

Obviously they have to prove one by clear and convincing evidence, and other by a preponderance.

This is a case where, given the nature of the offense, there is a presumption in favor of his detention, although of course that doesn't mean the burden has shifted in any way.  It's simply an issue of there being a presumption.

I find that the government in this case has amply met its burden as to both counts for the following reasons, among others, but I'm going to list, at least to my thinking, what some of the more critical reasons are:

First of all, I note the seriousness of the offense. This is obviously a very serious offense.  The fact that he was not apprehended, I guess is the best word, sooner, that doesn't in my mind at all lessen the seriousness of the offense.

There is ample testimony in the record that the defendant was, I believe the agent testified that in his experience he had not seen too many individuals that possessed the kind of sophisticated ability that this defendant possessed in terms of obfuscating his identity.

So it's not a function of it just being that law enforcement didn't think it was serious or that his appearance somehow in the scheme was not significant.  It was that he was

taking very significant steps, sophisticated steps, steps that were even difficult for the FBI to identify, showing that he's, in fact, very sophisticated.

So the fact that he wasn't identified sooner is not, I think -- it doesn't go to the seriousness of the offense, it goes to the sophistication of the defendant.

And indeed I think upon clarification the agent made clear that the process to identify him even after they had some more information about him, obviously there were particular things the FBI had to do to proceed, but it's really once he appears in person.

The agent was sure that he knew who the person behind the keyboard was, at best, only a few weeks, if that, before he's arrested. But certainly the affidavit and the go-bag, the ISIS flag, all sorts of indications I think make it clear that this is the person that was behind the keyboard. At least for purposes of a detention hearing.

This obviously isn't the trial, but for purposes of the detention hearing. I find that that is certainly sufficient to meet that burden.

I think Mr. Kobrinski is right. The charge here is material aid. They're not charging him with activity. They're charging him with material aid and to ISIS. So the fact that they can't specifically link something he did to a specific violent act, obviously if they could do that he would

be charged with more serious offenses.

But aiding and abetting a terrorist organization is significant and serious and dangerous in and of itself.

So I find that with respect to the seriousness of the offense and the strength of the evidence against him, those are facts that heavily weigh in favor of the government.

In terms of the amount of time that he would be looking at, that too is incredibly significant.  So that in and of itself I think is a very significant motivating factor for him to flee and something that I take into consideration, both just as an indication of the seriousness of the offense, but also the motivation for him to flee.

The defense made the argument that he wouldn't flee or that he wouldn't be motivated to flee now, given his health condition.  But of course he's looking at 360 here.  I think 360 months to life was the guideline, with the maximum of 20 years, of course.

The information he provides pretrial services I think spotty, at best.  But I think it leads me to believe that he was certainly not entirely candid with pretrial services or, at best, maybe he was just vague with respect to some key elements.  The travel, the wife situation are the ones I note in particular.

You always I think feel for a family who is willing to put everything they've got on the line for a child, and of

course I take that into consideration. Not every defendant enjoys that. Not every defendant has a family that will put everything up or that has anything to put up even if they are willing to support him.

So I take into consideration that he has a family which is willing to put everything up, but unfortunately this is a defendant that didn't take his own family into consideration as he was putting together this activity.

So he's using, I think it was the grandmother's credit union. He's using phones and identifying features for family members. And we can only believe he was doing so unbeknown to them that he was involved in this.

So to put the family in any kind of position, or to trust that the family who had no idea what was going on and the family that he had little consideration for when he was plotting these activities, as individuals who could either assure me that he would not do this any more, that he would not continue with his unlawful activity or that he could appear again, I don't find sufficient.

I do want to speak very specifically and directly with respect to his medical condition. Because, Mr. Cohen, I do think that although detention considerations are always difficult and serious, certainly within our pandemic times, for some defendants it is a life or death situation.

And I agree with you that it's a life or death

situation for, unfortunately, many defendants and it's a consideration that I have to take very seriously when I look at someone with a heart condition, and apparently a heart condition that he has had for his entire life.

So I take that into consideration, at least the information that I have before me.  So I don't have a full medical record or anything before me, but what I have is what he told pretrial services and what Mr. Cohen has represented.

I know that he is on a number of medications which is what essentially secures his health now.

But I have to tell you the fact that that 2018 surgery was in Cuba doesn't particularly sway me to think that the medical care he needs is -- wasn't getting medical care apparently in the United States, he was going back to Cuba, and getting surgeries in Cuba, and getting medical care in Cuba.

And I have to tell you, I can't imagine that at least the medical care at FDC isn't going to be better than the medical care that he chooses to get in Cuba, as opposed to here in the United States.

So in terms of the kind of medical care he's going to get, I don't find on this record that this is a defendant that can't be cared for at FDC or that he has a medical condition that FDC can't meet.

Maybe I'm wrong about that and, as the weeks play

out, you will tell me or you will move for a reconsideration of my bond or my detention order because FDC can't meet his condition or can't give him the medications.  And I will certainly hear that then, if that happens.

But this is not someone who has some sort of sophisticated medical regime that's being taken care of by a litany of doctors.

He goes back to Cuba to get that medical care which, by the way, makes, in my mind, the fact that he might flee back to Cuba that much more likely.  Because he's got a medical condition that's serious and that he treats in Cuba.

So in terms of him being cared for at FDC, I have nothing in this record that allows me to conclude that FDC could not care for his medical conditions.

Now, that being said, there is the pandemic, right?  So the risk to him at FDC, I have to weigh.  Is the risk for him contracting COVID, something that is so significant at FDC, that given the fact that I have found that he's a danger to the community and that he's a risk of flight is something that would sway me to give him a bond?  And it doesn't.

I watch the FDC numbers pretty closely.  Obviously these are difficult times for everybody, and certainly for federal institutions that are trying to keep their prisoners safe.

But I believe that FDC is well aware of his

condition.  They are treating him already, I believe with medications or at least that was the representation that was made at his initial appearance.

So I don't have any reason to believe, as we sit here today, that FDC won't take the additional precautions that they typically take and that I know that they take when they have high-risk individuals.

So Mr. Cohen, if you come back to me and say this is a high risk individual and FDC is doing nothing about it, I'll hear you then.  But they do take precautions for high-risk individuals.

I note that he is a young person, so I can't find that his medical condition is such that it outweighs my thinking and my analysis with respect to him being a danger to the community and that he poses a significant risk, in my mind, of not returning should he be given any bond.

And I don't find that the conditions of bond that have been recommended by the defense, that is, for him to have some sort of electronic monitoring or for his parents to watch him 24 hours or for him not to have a computer, I don't find that sufficient, given the gravity of the offense, the strength of the evidence and the amount of time that he would do.

So Mr. Kobrinski, I'll ask that you provide me, by close of business on Monday, with a proposed order that

outlines my findings. Please provide a copy of that or copy Mr. Cohen on that email.

MR. KOBRINSKI: Yes, your Honor.

THE COURT: All right.

Is there anything else on behalf of the United States?

MR. KOBRINSKI: Your Honor, we do need to set the preliminary hearing for this case and/or arraignment, which we don't have a grand jury.

THE COURT: Right. So to my clerk, a date?

COURTROOM DEPUTY: October 2nd is 14 days. Unless you want to do it in January?

THE COURT: No. No. I can't imagine Mr. Cohen is going to waive preliminary hearing.

MR. COHEN: October 7 is fine, your Honor.

COURTROOM DEPUTY: That's the 2nd, October 2nd. That's going to be at 1:00 p.m.

THE COURT: All right. I don't know who is on duty on October 2, but it's October 2, at 1:00 p.m. I guess it doesn't matter because (indiscernible).

So October 2, 1:00 p.m., I'll set it down for preliminary hearing and arraignment. Again, I don't think grand jury is going to be back by October 2, but you can decide what you do with arraignment on October 2.

Anything else, Mr. Kobrinski?

MR. KOBRINSKI:  No, your Honor.  Thank you.

THE COURT:  All right.  Mr. Cohen, anything else, on behalf of Mr. Blanco?

MR. COHEN:  Yes.  One.  Can we ask Mr. Guerra if he's now receiving all his medication?

THE COURT:  Mr. Guerra, are you getting all the medication you need?

THE DEFENDANT:  (Indiscernible) I only have once since I came here.  And only one time.

And then I haven't had any more.  I haven't had the (indiscernible).  I have been missing it two days already.

THE COURT:  Mr. Cohen, can you -- I'm sorry, Mr. Blanco -- Mr. Cohen, can you hear what medications he says he's not getting?

MR. COHEN:  I think it's Enalapril (phonetic) or something.  It's similar to that.  I have looked it up before.

So I know which one he -- the ones he was taking; I think I know the one he's not taking.

If the Court could give me a moment.

THE COURT:  Sure.

(Pause.)

MR. COHEN:  I think he's not getting, Enalapril.  E-n-a-l-a-p-r-i-l.

THE COURT:  Do you know what he takes that for?

MR. COHEN:  I know that it's a treatment for people

with congestive heart failure.

THE COURT:  All right.  Government, I expect that you will take any measures that you can to advise FDC that if there is something that's missing in his medication, I know the government can send an email.

MR. KOBRINSKI:  I just did it, your Honor.  And I referenced the medication.  I have a contact in the legal office of B.O.P. who has always been very good at getting things through.  So I just sent an email.

But obviously I'll follow up with a phone call if I don't hear anything in the next half an hour or hour.

THE COURT:  All right.  I'll expect you to take every effort that you can to make sure he gets his medication.

Sometimes they get to FDC and the medications that they are given outside of FDC, the doctor at FDC determines has to be at a different dosage or it needs to be a different medication, right.

So I'm not going to order FDC to -- I can't order FDC with respect to medications, but I know that at least in my experience sometimes that's the issue, that they are going to be (indiscernible).

All right.  Anything else, Mr. Cohen?

MR. COHEN:  Your Honor, one personal request.  I have been dodging emails from Judge Williams' chambers.  When do you expect to start the afternoon calendar, so I can respond

TRANSCRIBED FROM RECORDINGS OF AUDIO VISUAL TELECONFERENCE
HELD ON FRIDAY, SEPTEMBER 18, 2020

before I'm taken into custody?

THE COURT:  I might be texting her to watch that.

All right.  It's 2:12.  The afternoon calendar was supposed to start at 1:00.

But I have Mr. Horowitz and I can give you another -- I mean, I cannot do anything with respect to you, Mr. Cohen. We'll come back to you no earlier than 2:30.  Does that help you?

MR. COHEN:  I will reach out to chambers right now.

If that becomes a problem, I'll get back on at the end of the calendar.

THE COURT:  Okay.  So I'll give you until 2:30.

And then let me call the next case.

MR. COHEN:  Mr. Blanco --

THE COURT:  That's it for your personal needs today.

All right.  Let's call United States vs. --

COURTROOM DEPUTY:  Mr. Blanco, we're done with you.

If you could let the officer know we're finished and just send in the next person.  Thank you.

THE DEFENDANT:  (Indiscernible.)

THE COURT:  He will make arrangements to speak to you at FDC -- or not at FDC.  He will make arrangements to speak to you by phone.

THE DEFENDANT:  Okay.

(Proceedings were adjourned.)

TRANSCRIBED FROM RECORDINGS OF AUDIO VISUAL TELECONFERENCE
HELD ON FRIDAY, SEPTEMBER 18, 2020

TRANSCRIBER'S  CERTIFICATION

I, Judith M. Wolff, a Certified Realtime Reporter with offices in Smyrna, Georgia, do hereby certify:

That I reported on the Stenograph machine the proceedings recorded by video teleconference on Friday, September 18, 2020, in the matter USA vs. Jonathan Guerra Blanco, Case No. 20-mj-3562-LMR-1;

That "indiscernible" designations are the result of audio interference due to technological limitations beyond my control;

That said audio recording of the proceedings were reduced to typewritten form by me; and that the foregoing transcript is a true and accurate record of the proceedings to the best of my skill and ability.

This, the 21st day of October, 2020.

s/ JUDITH M. WOLFF, CERTIFIED REALTIME REPORTER
Signature of Transcriber

TRANSCRIBED FROM RECORDINGS OF AUDIO VISUAL TELECONFERENCE
HELD ON FRIDAY, SEPTEMBER 18, 2020